Filed 8/14/14  In re Sebastian Z. Ca4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

<table>
<tr><td>In re SEBASTIAN Z., a Person Coming Under the Juvenile Court Law.</td><td rowspan="2">D065378</td></tr>
<tr><td>SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>ASHLEY Z. et al.,<br><br>     Defendants and Appellants.</td></tr>
<tr><td></td><td>(Super. Ct. No. SJ12683)</td></tr>
</table>

APPEAL from an order of the Superior Court of San Diego County, Garry G. Haehnle, Judge.  Affirmed.

Patti L. Dikes, under appointment by the Court of Appeal for Defendant and Appellant Ashley Z.

William Hook, under appointment by the Court of Appeal for Defendant and Appellant Paul Z.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel, and Thomas C. Hughes, Jr., Deputy County Counsel, for Plaintiff and Respondent.

Stacey Otzmann, under appointment by the Court of Appeal for Minor.

Ashley Z. and Paul Z. separately appeal an order under Welfare and Institutions Code[1] section 366.26 selecting adoption as the permanent plan for their son Sebastian Z. and terminating their parental rights. They contend the evidence was insufficient to support the juvenile court's finding that Sebastian was likely to be adopted within a reasonable time. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

In November 2011 the San Diego County Health and Human Services Agency (the Agency) filed a petition under section 300, subdivision (b), alleging that Sebastian was exposed to violent confrontations between his parents involving Paul's use of physical force against Ashley that caused her to sustain physical injuries. Specifically, the petition alleged that in Sebastian's presence, Paul threw Ashley against a wall of the motel room they were occupying and headbutted her, causing injury to her nose. The force of the headbutt caused Ashley to lose consciousness, fall to the ground, and fracture her elbow. The Agency removed Sebastian from the parents after the police arrested Paul for spousal battery. The court ordered Sebastian detained in foster care. On December

---

[1] All statutory references are to the Welfare and Institutions Code.

2

22, 2011, the court issued a restraining order prohibiting Paul from contacting Ashley for a period of one year.

At the jurisdiction and disposition hearing in February 2012, the court sustained the petition and made a true finding on the section 300, subdivision (b) count. The court declared Sebastian a dependent of the court and ordered him removed from his parents' custody and placed in a foster home. The court ordered the Agency to provide the parents reunification services.

In its status review report for the six-month review hearing, the Agency concluded that both parents had "shown engagement in services but [required] more time and participation in services to fully comprehend their role in exposing their child to domestic violence and to learn tools to maintain healthy relationships to establish trust and provide stability and safety for their child." The Agency recommended the parents be provided six more months of reunification services. At the six-month review hearing in August 2012, the court continued Sebastian's out-of-home placement and ordered that the parents be provided services to the 12-month date of January 15, 2013.

In its report for the 12-month review hearing, the Agency noted that Paul and Ashley were continuing in a relationship and living together despite the restraining order prohibiting Paul from contacting Ashley. Paul had tested positive for marijuana and Ashley had tested positive for methamphetamine and told hospital staff that she and Paul had used ecstasy. The Agency was concerned about Ashley's substance abuse and the fact she had been dishonest about it with the social worker. Additionally, the Agency social worker and a number of Ashley's service providers had observed that Ashley was

3

emotionally unstable and needed psychiatric evaluation and medication to help stabilize her moods.

Paul had shown limited progress since the six-month review hearing. He was not enrolled in any services and had not shown progress in taking responsibility for his actions or understanding the impact that exposure to domestic violence had on Sebastian. The Agency reported it was most concerned about the fact that Paul and Ashley had both admitted having contact and residing with each other throughout the dependency proceedings "despite vehement denials throughout the case . . . about their contact with each other." The Agency concluded there was not a substantial probability that Sebastian would be returned to his parents by the 18-month date. Accordingly, the Agency requested that the court terminate reunification services for both parents and set a section 366.26 hearing.

At the 12-month review hearing, the court found the parents had not made substantive progress with their case plans and there was not a substantial probability that Sebastian would be returned to their custody within the next six months. The court terminated the parents' reunification services and set a section 366.26 hearing for June 27, 2013.

The court ultimately held the section 366.26 hearing on December 11, 2013. In an addendum report filed on November 15, 2013, for the hearing, the Agency reported that Paul was arrested for spousal abuse on November 1, 2013. He and Ashley, who was eight months pregnant, had been living together in hotels. During an argument over payment for a hotel room, Paul punched Ashley in the mouth and cut her lip. Ashley told

4

the arresting officer that before Paul hit her on the mouth, he put his hands on her throat and strangled her to the point that it was difficult to breathe for about 20 seconds. He then grabbed her face with his hands and pressed his fingers against her chin and cheeks, causing her teeth to lacerate the inside of her cheeks. She told the officer there had been 10 to 20 instances of domestic violence during the course of her and Paul's relationship.

At the section 366.26 hearing, the court found by clear and convincing evidence that Sebastian was likely to be adopted if parental rights were terminated and that none of the circumstances listed in section 366.26, subdivision (c)(1)(B)(1), that would make termination of parental rights detrimental to Sebastian existed. Accordingly, the court terminated parental rights and referred Sebastian to the Agency for adoptive placement.

*Sebastian's Placements*

Because the sole issue in this appeal is whether substantial evidence supports the court's adoptability finding, we address Sebastian's placements in greater detail. Sebastian has undergone six changes in custody since his initial detention in this case. He was first placed in a foster home where he stayed for about four months (November 16, 2011 to March 9, 2012). He was then placed with a nonrelative extended family member (NREFM) in Yorktown, Virginia for about five months (March 9, 2012 to August 14, 2012). On August 14, 2012, he was placed in a temporary respite home in Virginia for three days, and on August 17 he was returned to San Diego and temporarily placed in Polinsky Children's Center (PCC) (August 17, 2012 to September 12, 2013). He was next placed in a confidential foster home for nine and a half months (September 12, 2012 to June 21, 2013). On June 21, 2013, began his current placement, in which he

5

has done remarkably well.  At the time of the section 366.26 hearing, he had been in the home of his current caregivers for about six months.

The first night Sebastian was in his initial foster home, he woke up in the middle of the night, knocked over the night stand by his bed, and removed everything from the drawers.  In November 2011 the foster mother's adult daughter reported that Sebastian was aggressive and "really rough."  He had hit and kicked the foster mother and he climbed on furniture in her home and tried to jump off his high chair.  When he became upset, he bit himself and his jacket or tried to bite someone else.  He accompanied the foster mother to a doctor's appointment and became angry when she would not let him run around the clinic.  He kicked and bit the foster mother and yelled "help! help!" in the doctor's office.  He was not in daycare because he tried to bite another child there and used bad words.  He got angry when he did not get things he wanted, like gum and soda, and he refused to go to the bathroom in the toilet despite being potty trained.  He said "no" to everything and liked to grab women's breasts and say, "boobies boobies."

In January 2012, the foster mother's daughter reported that Sebastian had recently become more defiant than usual.  He said "no" to everything, yelled, fought, and did not want to go to sleep at night.  He bit another child placed in the foster home during a car ride and the bite left teeth marks on the child's hand.  The child had done nothing to provoke Sebastian.  Sebastian's caregivers told a psychologist who was providing Sebastian services that his behavior had worsened since his visits with his parents had increased.  He was mumbling more and had "meltdowns" for no reason, and he threw tantrums lasting three to four minutes about 25 times per week.

In March 2012, Sebastian began his placement with the NREFM in Virginia.  The NREFM reported that Sebastian continued to have "behavioral concerns."  He threw tantrums and hit the other child in the home.  He could not play alone and demanded to be the center of attention.  The NREFM stated that overall, "He is doing good.  We have our moments and are both adjusting."

Sebastian attended play therapy once a week during his Virginia placement.  His play therapy provider reported that he was very inquisitive and asked a lot of questions, which she considered good for a child his age.  The provider stated, "[Sebastian] is receptive to redirection, will volunteer statements, rather than needing to be asked exploratory questions and volunteers information, both of which are good.  He focuses on taking care of babies (baby dolls)[,] feeding them, changing them, etc.  This is a repeated theme in sessions."

On August 14, 2012, the NREFM notified the Agency that she would no longer be able to care for Sebastian because his aggressive behaviors, which included hitting, biting, and spitting, were no longer manageable.  Sebastian had bitten the caregiver's grandson with enough force to draw blood, and had hit the caregiver's disabled daughter.  As a result, the caregiver could no longer allow the children to play together.  Sebastian's behaviors had become so overwhelming that the caregiver resorted to physical discipline, including slapping him across the mouth.  The Agency placed Sebastian in a temporary respite home in Virginia that day.  On August 17, 2012, he was returned to San Diego and placed at PCC to await placement in a Foster Family Agency home.

On September 12, 2012, the Agency filed a section 387 petition alleging the court's previous disposition placing Sebastian in the home of a NREFM had not been effective in the protection or rehabilitation of Sebastian and was no longer appropriate. The petition recommended modifying the disposition to place Sebastian in the home of a foster caretaker. The court sustained the petition and ordered Sebastian placed in a licensed foster home.

The Agency placed Sebastian in a confidential foster home on September 12, 2012. The foster mother reported ongoing problems with his defiant and aggressive behavior. He had problems with sharing and he hit other children in the home. He was difficult to put down to bed for the night and he woke up in the morning and screamed until he got out of bed. The foster mother said Sebastian's behavior was manageable with one-on-one attention. She had to constantly supervise him or he would get into trouble.

Sebastian was in individual therapy and his therapist reported that he responded well in therapy. The therapist described Sebastian as "a very smart boy who is having some aggressive and acting out behaviors." The therapist was teaching him to say what he wanted and did not want instead of acting out in an aggressive manner.

In its report for the section 366.26 hearing, the Agency noted Sebastian continued to present significant behavioral challenges. Although he could be charming, sweet, and playful and he responded well to attention, his caregiver reported that he could also be defiant and aggressive toward adults and other children, and he had significant tantrums. He sometimes awoke early in the morning and dumped food out of cabinets.

8

On June 21, 2013, Sebastian's foster mother gave a seven-day notice to terminate Sebastian's placement due to severe behaviors, including tantrums, defiance, aggression toward adults and younger children, eating until sick, and getting up in the middle of the night. The Agency moved Sebastian into his current confidential licensed foster home, which had an approved adoptive home study. The Agency informed the new caregivers of Sebastian's negative behaviors and attachment difficulties, and reported that the caregivers had both used techniques learned from their adoption specialty classes and had shown an understanding of Sebastian's needs.

In an addendum report filed on September 27, 2013, for the section 366.26 hearing, the Agency noted Sebastian had responded well to his caregivers and was forming an attachment to them. He was becoming a different and happier child. After a month in the home, Sebastian became more relaxed and claimed the house as "my house." He was beginning to use words like "I'm mad," instead of pinching, hitting, or kicking. The Agency reported that Sebastian was "highly adoptable" and the caregivers had "a willingness to adopt him."

In a second addendum report filed on November 15, 2013, the Agency reported that "Sebastian remains doing well in his current placement and his current caregivers continue to express interest in adopting Sebastian." The caregivers reported a number of specific examples of Sebastian's improved behavior and emotional health, including his eating with manners and minimal playing at the table; saying "I'm sorry" more and understanding that his actions can hurt people's feelings; talking about his friends at daycare and sharing the events of his day, both good and bad; talking about long-term

future plans; falling into the caregivers' daily and weekly routine; being ready to go when being picked up at daycare; and not playing as rough. The Agency concluded that Sebastian was residing "in a safe and positive home environment with caregivers who love and care for him."

## DISCUSSION

### *Sufficiency of the Evidence To Support the Court's Adoptability Finding*

Paul and Ashley contend there was insufficient evidence to support the juvenile court's finding that Sebastian was likely to be adopted within a reasonable time. They argue that Sebastian's severe emotional and behavioral issues made him generally unadoptable. We disagree.

" 'The juvenile court may terminate parental rights only if it determines by clear and convincing evidence that it is likely the child will be adopted within a reasonable time. [Citations.] In making this determination, the juvenile court must focus on the child, and whether the child's age, physical condition, and emotional state may make it difficult to find an adoptive family. [Citations.] In reviewing the juvenile court's order, we determine whether the record contains substantial evidence from which a reasonable trier of fact could find clear and convincing evidence that [the child] was likely to be adopted within a reasonable time. [Citations.]' [Citations.] We give the court's finding of adoptability the benefit of every reasonable inference and resolve any evidentiary conflicts in favor of affirming. [Citation.]"

"A child's young age, good physical and emotional health, intellectual growth and ability to develop interpersonal relationships are all attributes indicating adoptability.

10

[Citation.] ' "Usually, the fact that a prospective adoptive parent has expressed interest in adopting the minor is evidence that the minor's age, physical condition, mental state, and other matters relating to the child are not likely to dissuade individuals from adopting the minor. In other words, a prospective adoptive parent's willingness to adopt generally indicates the minor is likely to be adopted within a reasonable time either by the prospective adoptive parent or by some other family." ' " (*In re Gregory A.* (2005) 126 Cal.App.4th 1554, 1561-1562.) However, the likelihood of adoptability may also be satisfied by a showing that a child is generally adoptable, independent of whether there is a prospective adoptive family. (*In re A.A.* (2008) 167 Cal.App.4th 1292, 1313.)

The evidence sufficiently supports the court's finding by clear and convincing evidence that Sebastian was likely to be adopted. At the contested section 366.26 hearing, the court admitted into evidence the initial assessment report and two addendum reports that the Agency prepared for the section 366.26 hearing. In one of the addendum reports, the Agency concluded Sebastian was generally and specifically adoptable. The Agency described him as "smart, engaging, fun, and very cute." In its initial assessment report, the Agency concluded Sebastian was generally adoptable and described him as "bright, charming, and adorable."

The Agency reported that Sebastian's current caregivers had an approved adoptive study and "a willingness to adopt him." In addition, there was a paternal relative in Missouri who was interested in placement and had experience with adoption. The San Diego County Adoptions Coordinator reported there were 61 families in San Diego County that would be interested in a child with Sebastian's characteristics, which

11

included his age, ethnicity, gender, attachment difficulties, aggressive behaviors, and family history involving drug use. The Agency viewed Sebastian as "highly adoptable." The court was entitled to find the Agency's opinion credible, and to give great weight to its assessment. (See *In re Casey D.* (1999) 70 Cal.App.4th 38, 53.)[2]

As we noted in our statement of facts, the Agency reported in its November 2013 addendum report for the section 366.26 hearing that Sebastian continued to do well in his current placement and that his current caregivers continued to express interest in adopting him. He was adjusting well to the daily and weekly routine of the caregivers' home; his behavior was improving; he had become far less aggressive; he was forming attachments; and he had made friends in daycare. The fact that Sebastian was able to attend fulltime daycare is itself evidence of dramatic improvement in his emotional and behavioral issues that the parents contend made him generally unadoptable.

Based on the evidence that Sebastian was a bright, charming, adorable four-year-old child; there were numerous families in San Diego County willing to adopt a child with his characteristics; a paternal relative was interested in adoptive placement; his severe emotional and behavioral issues had dramatically improved in his current foster placement; and his current caregivers had expressed willingness to adopt him, the court

---

2    In its oral ruling at the section 366.26 hearing, the court found: "There are a number of families that he is generally adoptable to, 60 some odd families within the county that would adopt a child [with] Sebastian's characteristics. He is also specifically adoptable by the current caregivers."

reasonably found by clear and convincing evidence that Sebastian was likely to be adopted within a reasonable time.[3]

DISPOSITION

The order selecting adoption as Sebastian's permanent plan and terminating parental rights is affirmed.

_____<br>HALLER, J.

WE CONCUR:


_____
McCONNELL, P. J.


_____
IRION, J.

---

[3] The Agency filed a motion to augment the record with additional evidence of subsequent events contained in the juvenile court file: a permanency planning review report dated June 13, 2014, and the court's June 13, 2014, minute order. We deny the motion.